Harper v. Santos is next for argument. Mr. Williams. May it please the court. Counsel. Good morning. My name is R. Nelson Williams from the law firm Thompson, Coburn, and St. Louis. And I have the privilege today of representing the appellant, Mr. Nathaniel Harper. I was appointed to represent Mr. Harper in September 2014. And by way of background, that was nearly two years after he filed his complaint in this matter. It was after he'd made four requests to be appointed to counsel. It was after he had been deposed. And it was after the appellees filed the motion for summary judgment that is the very subject of this appeal. I mention this because I want to point out that it has taken time for him to get the justice that he's seeking by way of this appeal. But that's what brings us here today. Now the issue on this appeal is whether the district court erred when it granted the appellee's motion for summary judgment. And based on the extensive record evidence, as well as this court's precedence, we believe that the answer to that question is a clear and resounding yes. The district court's decision should be reversed for at least two reasons. The first is that the appellees ignored obvious signs that their treatment was ineffective. And the second is that the appellees ignored the advice of other medical professionals to Mr. Harper's detriment. The standard review is a de novo standard of review. Now when we're talking about medical indifference, there are essentially two factors. It's got to be an objectively serious medical condition. And there has to be evidence that the defendants subjectively were aware of this medical condition and consciously disregarded it. And as I said before, there are essentially two reasons. And one of those reasons is, one of the reasons why the district court's decision should be reversed is that they ignore the advice of other medical professionals. And one of the key cases that I know this court is well familiar with is the penalty. Well, wait a minute. Ignoring the advice of other medical professionals doesn't make it a deliberate indifference case, does it? Well, I think with respect to Petty's and also the court's recent decision in Zia versus Sue, there is some evidence that ignoring the advice of other medical professionals, particularly the individuals who performed. Ignoring is not accepting. Let's focus on that difference, please, between disagreeing with advice of other medical professionals and ignoring the problem in their advice. Sure. And here there is evidence that that advice was simply ignored. With respect to a couple things, first, there was the discharge summary that I know the court has seen as part of the record evidence here. There's a discharge summary, and Mr. Harper underwent nine surgeries in six weeks. Nine surgeries in a six-week time period. And after, when he returned to Centralia Correctional Center, he was given Tylenol to treat his pain. The discharge summary from the treating physicians at St. Mary's Hospital recommended that not only he get Tylenol, but he also get Vicodin. In the minute that Mr. Harper returned to Centralia Correctional Center, after undergoing nine surgeries, Dr. Santos discontinued the Vicodin and allowed him to suffer in pain. Did they recommend that he continue the Vicodin indefinitely, or what was the? It was the explicit instructions in the discharge summary was as needed. It says as needed, Vicodin 500 milligrams. Defense is telling us Vicodin was recommended but not prescribed by the hospital. Correct. It was recommended but not prescribed. And it was recommended but not prescribed, but once Dr. Santos prescribed the Tylenol, Mr. Harper pleaded multiple times and put him and the nursing staff on notice that the Tylenol he was receiving was not sufficient to alleviate his pain. You're not telling us, though, that a prisoner is entitled to pain medication as he requests under the Constitution? No, but what I am saying... There's got to be room for medical judgment about that, right? Correct. What I am saying, though, is that where there is evidence that a doctor's continued course of treatment has been ineffective as proven by the complaints, the continuous complaints of the plaintiff here, Mr. Harper, that the jury should be entitled to determine whether or not that as evidence of medical indifference. And I think that's something that the Petty's decision tells us. And here, there is evidence that he pleaded multiple times. I need pain medication. I'm in pain. I think I'm dying here. He was given pain medication. He just didn't like the one he got. Vicodin is a narcotic. Do you think prisons might have very good reasons for not wanting to prescribe narcotics? Yes, I'm sure there are. I can tell you that nine days ago, this court heard an appeal where prisoners who were prescribed and allowed to use narcotics hid them, sold them to another prisoner. The other prisoner in prison took an overdose and died from a narcotic overdose. Prisons don't want to do that. And one way to do it is not to use narcotics unless it's just desperately necessary. In the other case, one of the arguments, by the way, is that it violated the Eighth Amendment to let those prisoners use narcotics rather than some other pain relief such as Tylenol. If you put these two cases together, you've got the prisons coming and going. They violate the Constitution whether they do or whether they don't. And that can't be right, can it? I think, as applied to this case, that Vicodin should have been prescribed to my client. I think that there's sufficient evidence here that his continuous pleas of help, his continuous pleas that he was suffering in pain... Well, one thing we know is that it's not possible to diagnose whether there's pain. Continuous pleas can easily be faked. And that's what was going on in the other case that I just mentioned. The people who were demanding and getting narcotics were faking. They got narcotics, which they sold for money, and somebody died as a result. Now, if we had some easy way to determine whether somebody is overstating the degree of pain, then we could solve this problem. But we don't have that way. And I think that if it was just pain that we were talking about, then I think that would be one thing. But it's not. We've got his complaints of pain. We've also got his complaints of hunger. On January 12, 2011, when my client was readmitted back to Centralia Correctional Center after undergoing surgery, he was 165 pounds. On March 22, 2011, after 2 months in the care of the appellees, he was 138 pounds. That's a 27-pound loss in a 2-month period. Well, they were providing him supplemental things that he could tolerate, right? Certain types of drinks and other things? There was evidence of him receiving certain kinds of protein drinks and that kind of thing, correct. But he made clear to them that there are certain kinds of foods he could tolerate, certain kinds of foods he could not tolerate, and the foods that he could tolerate, he was not given. We're talking about deliberate indifference, though, not negligence. When they're attempting to provide him with things that they think will work, maybe they were negligent and should have provided something else. Just because he wants eggs rather than what they were giving him doesn't make it deliberate indifference. But I think the difference is that his request for eggs wasn't just because he liked eggs. It was because it was the one thing that he could keep the food down. In the Petty's holding where it says, evidence that the patient repeatedly complained of enduring pain, or here I would substitute enduring pain with hunger, and no modifications in care. And there were no sufficient modifications for him to recuperate. I think as evidenced by a 27-pound loss in a 2-month period, that is significant. And that is something that I think a jury should be entitled to hear as to whether or not he was given sufficient medical care. The other thing that I will mention is the kidney ultrasound. Now, when he was discharged from St. Mary's Hospital, the doctors, his treating physicians, recommended that he undergo a renal ultrasound every three months on his kidney. And you might have seen in the record, there was a declaration from my client where he says at one point he asked Dr. Santos for another ultrasound, and Dr. Santos screamed no at him. And I anticipate that Dr. Santos or his counsel might argue that, well, it was just recommended by St. Mary's and it wasn't ordered by St. Mary's. But the problem with that argument is that in the January 12, 2011 notes from the Centralia Correctional Center, in the same order that Dr. Santos discontinued the Vicodin, he ordered an ultrasound every three months, his own orders. He ordered an ultrasound every three months and failed to do that. So not only is he disregarding St. Mary's requests and recommendations, he's disregarding his own orders. Is there evidence that that harmed the plaintiff? There is not any evidence at this time about whether or not he's had any complications from it. He's undergone some tests, but I would argue that an ultrasound would be a more comprehensive and more thorough test than a blood test that he's been given. But when you take all three of these in totality, the evidence of the pain medicine, the evidence of the food, the evidence of the ultrasound, the evidence of people laughing at him when he presented himself to the facility, people at Nurse Dean instructing him to empty his own colostomy bag. I mean, the totality of the evidence here really shows a level of egregiousness and disregard for his health that I think a jury should be entitled to hear, and I think that this court should, I'm asking this court to reverse the district court's decision and allow this to be heard. Thank you. Thank you, Mr. Williams. Mr. O. Excuse me, Judge. Good morning, Your Honors. My name is Robert Vogt, and I represent the defendants in this case, Dr. Santos and Nurse Dean. Thank you for giving me the opportunity to be heard. This case, as you know, comes before you as a result of the district court's summary judgment order. We believe the order was correct and that this court should affirm what the trial court did in this case. As you know from the record in this case, Mr. Harper came back from the hospital after counsel mentioned having nine surgeries. He was placed in the prison infirmary, and at that time, until his colostomy bag was removed, he was provided with an extraordinary amount of attention. All of this is undisputed in the record. We provided the court with typed transcriptions of all the nursing notes as well as Dr. Santos' notes to make sure it's clear. As you know from reviewing the record, Dr. Santos examined Mr. Harper during that 87-day period on 31 different occasions. The nurses assessed him some 350 occasions. He was constantly provided with attention by the medical staff at the prison, and there's no basis to suggest that he was ever ignored or disregarded or anything like that. The record simply does not support that. With regard to the pain management, Your Honor, I think the best thing for me to do is just quote from this court that whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference. And that, of course, comes from this court's decision in Snipes v. Detella, and that's what we have here. There's no allegation, Your Honors, that Mr. Harper was denied pain medication, none at all. Dr. Santos, as the record reflects, tried to adjust his pain medications as he went along. He changed those orders nine different times. Mr. Harper's complaint in this court is that he wasn't given Vicodin, and I don't believe that alone is entitled to constitutional protection. With regard to his diet, Your Honors, again, it's important to note that when he was discharged from the hospital, he was discharged on a regular diet with oral fluid intake. Once he got back to the prison, that was no longer an option for him because he was vomiting and he was nauseous. So what they did at the prison was they provided him an IV to ensure he had proper fluids so that he couldn't vomit those fluids up. And then Dr. Santos again adjusted his diet as he went along. He gave Ensure, he gave protein drinks. As time went along, and the record confirms this, Mr. Harper healed, he got better, he was able to eat more solid foods as the time went on. And Dr. Santos did actually more than what was recommended by the hospital, provide it by ensuring that he had proper fluid through an IV, as well as the different types of food diet adjustments that Dr. Santos made. As far as the kidney examinations, Your Honors, as counsel noted, initially after the colostomy egg was removed, they took an initial ultrasound to compare the ultrasound that he had three months after he was discharged from the hospital. No change in the cyst had occurred. From that point forward, Dr. Santos elected to monitor Mr. Harper's kidney function by using blood and urine tests. And those are a completely appropriate means of trying to measure kidney function. If something would come up, then you would investigate further. But the blood and urine tests are able to be done on-site in the facility, and they provide a very good assessment of how the patient's kidneys are doing. There was nothing here, Your Honors, to suggest that Dr. Santos was deliberately indifferent to Mr. Harper, and we'd ask this court to affirm the trial court's decision. As for Nurse Dean, Your Honors, the plaintiff testified, as you may recall from reviewing the materials in this case, that Nurse Dean was one of the nurses who initially failed to respond promptly to his abdominal complaints. The records in this case, though, show that Nurse Dean, her shift ended on December 3rd at 7 a.m. Mr. Harper did not even present to the infirmary until 8.30 a.m. when Nurse Dean was already gone. She no longer worked there between that 7 a.m. point in time and when he was transferred to the hospital, so she wasn't even there to have done anything to Mr. Harper. She never was there, you're indicating, never there when he was being treated? Well, I can't say about – I don't think – no, her testimony is no. She left at 7 a.m. Her shift ended at 7, and she was not working again until after he was transferred to the hospital. She did see him when he returned. She saw him when he came back. Yes, yes, I'm sorry. Multiple times. Again, that's reflected in the records. My best read of it, Your Honors, is that there was a personality issue between Mr. Harper and Nurse Dean. One reason or another, I don't know, but the bottom line was that he alleges that on a single occasion Nurse Dean refused to take care of his colostomy bag, and that certainly is something that a nurse ought not to do. But I would urge the Court to recognize that even if that one occasion did occur, it's not sufficient to find a deliberate indifference, and certainly it caused no longstanding or permanent injury to Mr. Harper. It was an inconvenience at best. And finally, there was the issue, as you may recall, with Nurse Dean taking steps to remove the pillow. He had two pillows. Prison security requires that they only have one pillow. She removed the pillow and issued him a disciplinary ticket. The ticket was upheld. But again, I don't know if that's really an issue of constitutional proportions either. Your Honors, in the end, I believe both Nurse Dean and Dr. Santos provided constitutionally adequate health care to Mr. Harper, and I would ask this Court to affirm the district court's decision. Thank you. Thank you very much. Anything further, Mr. Williams? I believe I might have used all my time up already, so 10 minutes goes by very quickly. If Judge Easterbrook thinks you've got extra time, you've got extra time. Thank you very much. I don't have anything further unless you have anything further for me. I just thank the Court. Again, I was appointed counsel, and I thank the Court for taking this appeal. We appreciate your willingness. I know it wasn't this Court who appointed you, but we appreciate your willingness to assist the district court. Thank you. Thank you.